UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel.
MARTIN G. MCNULTY and MARTIN G.
MCNULTY, individually,

              Plaintiffs,              Case No. 08-cv-12728

v.                                     Paul D. Borman
                                     United States District Judge

REDDY ICE HOLDINGS, INC., REDDY
ICE CORPORATION; ARCTIC GLACIER
INCOME FUND; ARCTIC GLACIER INC.,
ARCTIC GLACIER INTERNATIONAL,
INC.; and HOME CITY ICE COMPANY,
INC.,

              Defendants.
_____

ARCTIC GLACIER INC. and ARCTIC
GLACIER INTERNATIONAL, INC.,

              Counter-Plaintiffs,

v.

MARTIN G. MCNULTY,

              Counter-Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS, AND GRANTING MARTIN G. MCNULTY'S MOTION TO DISMISS COUNTERCLAIM

This matter is before the Court on Reddy Ice Holdings, Inc. and Reddy Ice Corporation's

("Reddy Ice") Motion to Dismiss (Dkt. No. 27), The Home City Ice Company's ("Home City")

Motion to Dismiss (Dkt. No. 28), Arctic Glacier Income Fund, Arctic Glacier Inc. and Arctic Glacier

1

International Inc.'s ("Arctic Glacier") Motion to Dismiss (Dkt. No. 30) and Counter-Defendant

Martin G. McNulty's Motion to Dismiss Counterclaim (Dkt. No. 41). Plaintiff/Relator Martin G.

McNulty filed responses to Defendants' motions to dismiss. (Dkt. Nos. 46, 47, 48.) Defendants

filed replies. (Dkt. Nos. 50, 51, 54.) Arctic Glacier filed a response to McNulty's motion to dismiss

the counterclaim. (Dkt. No. 49) and McNulty filed a reply (Dkt. No. 52). The Court heard oral

argument on all motions on November 16, 2011. For the reasons that follow, the Court GRANTS

the motions to dismiss this *qui tam* action[1] and GRANTS McNulty's motion to dismiss Arctic

Glacier's counterclaim.

**INTRODUCTION**

Relator Martin G. McNulty brought this *qui tam* action under the Federal False Claims Act,

31 U.S.C. 3729(a)(1),(2) and (3) ("FCA"), asserting claims on behalf of the United States alleging

that Arctic Glacier, Reddy Ice and Home City engaged in a nationwide market allocation conspiracy

and submitted fraudulent overcharges to the federal government for purchases of packaged ice. The

United States declined to intervene in McNulty's lawsuit. Defendant Arctic Glacier has filed a

counterclaim against relator McNulty, alleging that his filing of the instant lawsuit constitutes a

breach of an agreement in which he released all claims against Arctic Glacier, his former employer.

---

[1] The statutory requirement that the government consent to any dismissal of a pending *qui tam* case does not apply to involuntary dismissals. *United States ex rel. Laucirica v. Stryker*, No. 09-cv-63, 2010 WL 1798321, at *1 n.1 (W.D. Mich. May 3, 2010) ("U.S.C. § 3730(b)(1) provides that '[t]he action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.' However, the requirement of government consent does not apply to involuntary dismissals." (citing *Minotti v. Lensink*, 895 F.2d 100, 103 (2d Cir.1990); *Shaver v. Lucas Western Corp.*, 237 F.3d 932, 934 (8th Cir.2001)).

Defendants have each filed motions to dismiss the *qui tam* action, arguing that this Court lacks subject matter jurisdiction over the *qui tam* claims and that the FCA claim is not pleaded with sufficient particularity. McNulty has filed a motion to dismiss Arctic Glacier's counterclaim, arguing that he was unaware of his *qui tam* claim at the time he signed his release and that, in any event, enforcement of such a release would be against public policy.

## I.   BACKGROUND

### A.   The *Qui Tam* Complaint, The Government's Election to Not Intervene and The Unsealing and Transfer of the Matter to this Court

Relator Martin G. McNulty filed his *qui tam* Complaint under seal in this District on June 25, 2008; the case was assigned the Honorable Julian Abele Cook. (Dkt. No. 1.) Judge Cook granted the United States several extensions of time to conduct its investigation of the relator's allegations and to determine whether or not to intervene in the action, keeping all matters under seal pending the United States' election regarding intervention. (Dkt. Nos. 4, 6, 8, 10, 12 and 16.) On March 3, 2011, the government filed its Notice of Election to Decline Intervention. (Dkt. No. 15.) On April 20, 2011, the Court entered an Order declaring that the Complaint be unsealed and served on the Defendants and that all matters previously filed in the action, apart from the April 20, 2011 Order and the Complaint, remain under seal. (Dkt. No. 17.)

On July 5, 2011, the Defendants filed an unopposed motion to have the case reassigned to the undersigned, based upon a collection of related cases over which this Court presently presides. (Dkt. No. 26.) The related matters include a multidistrict antitrust action, *In re: Packaged Ice Antit. Litig.*, No. 08-MDL-1952 (filed on June 5, 2008), a securities fraud action, *Chamberlain v. Reddy Ice, et al.*, No. 08-13451 (filed on August 8, 2008), and a whistleblower action filed by the relator

in this *qui tam* action, Martin McNulty, *McNulty v. Reddy Ice, et al.*, No. 08-13178 (filed on July 23, 2008). All of these cases involve similar, and in some cases identical, allegations relating to the alleged underlying market allocation agreement among Arctic Glacier, Reddy Ice and Home City, which relator McNulty alleges resulted in the overcharges to the government that form the basis for the instant *qui tam* action. On July 25, 2011, Judge Cook signed an Order transferring the action to this Court. (Dkt. No. 38.)

**B.      The Allegations of the *Qui Tam* Complaint**

Relator McNulty alleges that as early as 1997, Defendants increased both the purchase price and distribution price of packaged ice above competitive levels by secretly agreeing to: (a) sell and distribute packaged ice at artificially inflated prices, (b) rig bids for ice purchase and distribution contracts, and (c) allocate customers and markets by refusing to sell or distribute packaged ice to each others' customers or in each others' territories. The Complaint alleges that this conspiracy increased the purchase and delivery price of packaged ice to all purchasers, including the federal government. (Compl. ¶ 2.)

The Complaint alleges that McNulty was terminated by his employer, Arctic Glacier after he learned of and refused to participate in the alleged conspiracy. Shortly after his termination, on May 26, 2005, McNulty informed the federal government of the existence of the alleged unlawful conspiracy and began working directly with the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) to provide information concerning the existence, scope and effect of the conspiracy. (Compl. ¶ 3.)

McNulty asserts that as a result of the information provided by him to the government, the DOJ, on June 17, 2008, announced that Home City had pleaded guilty to conspiring with its

4

competitors and the government's investigation of the other Defendants was ongoing. (Compl. ¶ 4.) McNulty asserts that he is the "original source with direct and independent knowledge of the substantive or core allegations" in his *qui tam* Complaint. (Compl. ¶ 5.)

McNulty alleges that Reddy Ice is the largest manufacturer and distributor of packaged ice in the United States, that Arctic Glacier is the second largest manufacturer and distributor of packaged ice in the United States and that Home City is the third largest. (Compl. ¶¶ 9, 14, 15.) McNulty alleges that "during the relevant time period," the United States entered into hundreds of contracts, and paid in excess of $150 million, for the purchase and distribution of ice. (Compl. ¶ 6.) McNulty makes several allegations regarding the characteristics of the packaged ice industry that he asserts make that industry vulnerable to anticompetitive conduct. (Compl. ¶¶ 18-21.)

McNulty alleges that he first became aware of the allegedly collusive agreement among the Defendants not to compete in November, 2004, just a month before his employer, Party Time Ice, was acquired by Defendant Arctic Glacier. (Compl. ¶¶ 22-24.) McNulty alleges that in January, 2005, after the acquisition of Party Time by Arctic Glacier, Mr. Keith Corbin of Arctic Glacier, McNulty's supervisor, told him about the details of the agreements among the Defendants to "geographically divide the market for the sale and delivery of packaged ice." According to McNulty, Mr. Corbin explained to him that the conspiracy extended "throughout the United States." (Compl. ¶¶ 25-26.) McNulty alleges that when he informed Mr. Corbin of his belief that such an agreement to allocate territories was unlawful and that he could not participate in any such agreement, Arctic Glacier terminated him on January 27, 2005. (Compl. ¶ 27.) Following his termination, McNulty worked closely with the DOJ and the FBI, at times wearing a wire and tape recording conversations with alleged players in the conspiracy, assisting the government in collecting evidence to prove "both

the existence and scope" of the alleged illegal conspiracy. (Compl. ¶¶ 28-32.)

McNulty alleges in his Complaint that the federal government is "a substantial purchaser of packaged ice, having paid in excess of $150 million for the procurement of ice from the Defendants during the course of the Defendants' conspiracy." (Compl. ¶ 34.) McNulty attached to his Complaint a list of contracts between the Defendants and various agencies of the federal government, principally the Department of Defense and the Department of the Interior, purportedly including purchases of ice in the years 2001-2007. (Compl. ¶ 35, Ex. 2.) McNulty alleges that in the course of assisting the DOJ and the FBI in their investigation into the packaged ice industry, on September 7, 2005, he learned from an employee of Arctic Glacier, and communicated to the federal government, that Arctic Glacier allegedly was "price gouging" the Federal Emergency Relief Agency (FEMA) on sales of ice for the Hurricane Katrina relief effort. (Compl. ¶ 36, Ex. 3.) In his Complaint, McNulty seeks to recover for alleged overcharges to the federal government for the sale and distribution of packaged ice from 1997 through the present. (Compl. ¶ 37.)

## C.     Arctic Glacier's Counterclaim

Arctic Glacier asserts in its Counterclaim that McNulty's *qui tam* action against Arctic Glacier is barred by a release agreement he signed on February 17, 2005, in exchange for a severance package negotiated as part of his termination by Arctic Glacier. McNulty executed a Release, Discharge and Non-Competition Agreement ("the Release"), waiving any and all claims against Arctic Glacier in exchange for six months' severance pay. (Dkt. No. 31, Counterclaim, Ex. A, Release Agreement ¶ 2.) Arctic Glacier alleges that McNulty has breached the Release Agreement by filing this *qui tam* action, which Arctic Glacier asserts is based entirely on the alleged market allocation conspiracy of which McNulty expressly had knowledge prior to signing his release, as

6

found by this Court in its May 29, 2009 Opinion and Order issued in McNulty's whistleblower action. Arctic Glacier seeks return of the severance pay remitted to Mr. McNulty and also seeks its costs and attorneys' fees incurred in connection with defending the *qui tam* action.

## II.    STANDARD OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility

7

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

## B.    Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) permits dismissal for "lack of jurisdiction over the subject matter." Lack of subject matter jurisdiction may be asserted at any time, either in a pleading or in a motion. Fed. R. Civ. P. 12(b)(1); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993) (holding that to

8

survive a motion to dismiss, a complaint must contain "either direct or indirect allegations respecting all material elements to sustain a recovery under some viable legal theory"). "Where subject matter jurisdiction is challenged pursuant to [Rule] 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002) (citing *Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir.1990)).

### III.   ANALYSIS[2]

#### A.   The Court Lacks Subject Matter Jurisdiction Over The *Qui Tam* Complaint Which, In Any Event, Fails to Plead a FCA Claim With Sufficient Particularity

"The FCA, 31 U.S.C. § 3729 *et seq.*, is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 645 (6th Cir. 2003) ("*Bledsoe I*"). The FCA, as part of its enforcement mechanism, permits a private party, known as a "relator," to file suit alleging FCA violations on behalf of the government. Section 3730(b)(2). A *qui tam* complaint filed by a relator is filed and remains under seal for a period of sixty days, during which time the government may elect to intervene. *Id.* If the government elects not to intervene, as the government has done in the instant case, the relator may proceed with the suit and, if successful in recovering funds, is entitled to 25-30% of the recovery. Section 3730(d)(2).

---

[2] With the exception of Arctic Glacier's arguments regarding personal jurisdiction and the effect of a release signed by Mr. McNulty subsequent to his termination from Arctic Glacier (Arctic Glacier's Arguments II and VII), the three Defendants' motions to dismiss present the same arguments, relying on the same legal theories and largely on the same cases, and the Court treats those arguments collectively. Accordingly, the Court first addresses the arguments presented by the Defendants regarding subject matter jurisdiction and the sufficiency of relator McNulty's pleading of his FCA claim. The Court will then separately address McNulty's motion to dismiss Arctic Glacier's counterclaim.

9

The legislative goals in enacting the FCA have been interpreted to be twofold and inherently competing:

> On the one hand, the *qui tam* provisions seek to encourage whistleblowers to act as private attorneys-general in bringing suits for the common good. On the other hand, the provisions seek to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud.

*Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005) (internal quotation marks and citations omitted).

The FCA restricts a relator's ability to proceed, however, if the *qui tam* claims are based on publicly disclosed information and the relator is not the original source of the information. Specifically, the FCA provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). "In other words, a relator may continue the *qui tam* suit based on publicly-disclosed information only if the relator is the original source of that information." *Bledsoe I*, 342 F.3d at 640.

Each of the Defendants argues that the *qui tam* Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because: (1) the Court lacks subject matter jurisdiction over the claims because the claims are based upon public disclosures and McNulty is not an original source; (2) the allegations fail to plead fraud with the particularity required under the FCA; and (3) certain claims are barred by the applicable statute of limitations.

**1.    The Court lacks subject matter jurisdiction over McNulty's *Qui Tam* Complaint**

"[T]he FCA precludes a federal court from exercising jurisdiction over allegations in a *qui*

10

*tam* suit that are based upon publicly-disclosed information, unless the relator is the original source of that information." *Bledsoe I*, 342 F.3d at 645. The Sixth Circuit has held that "'based upon' means 'supported by,' which includes any action based *even partly* upon public disclosures." *Id.* at 646 (emphasis in original). Thus, "a person who bases any part of a FCA claim on publicly disclosed information is effectively precluded from asserting that claim in a *qui tam* suit." *Id.* In *Bledsoe I*, the court held that a wrongful termination suit by a former CHS medical director that alleged some of the same underlying fraudulent billing practices as the relator alleged in his *qui tam* complaint, that was filed after the government declined to intervene in the *qui tam* case but before relator had served the defendants with his amended *qui tam* complaint, had alerted the public to the underlying fraud and compelled the conclusion that the relator's *qui tam* suit was "based upon" publicly disclosed information. *Id.* at 639. *See also Walburn*, 431 F.3d at 974 (adopting a "broad construction of the public disclosure bar, which precludes individuals who base *any part* of their allegations on publicly disclosed information from bringing a later *qui tam* action.") (emphasis in original); *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332-33 (6th Cir. 1998) (finding substantial identity between publicly disclosed facts in a previously filed whistleblower complaint where the only difference between the whistleblower and the *qui tam* complaint was the allegation that false claims were submitted to the government). The Sixth Circuit has held that a "public disclosure reveals fraud if the information is sufficient to put the government on notice of the likelihood of related fraudulent activity." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2009) (internal quotation marks and citation omitted). "To qualify as a public disclosure of fraud, the disclosure is not required to use the word "fraud" or provide a specific allegation of fraud." *Id.*

11

"'Original source' means that the relator possesses 'direct and independent knowledge of the information on which the [publicly disclosed] allegations are based' and voluntarily provided that information to the government before filing the *qui tam* action and prior to any public disclosure.'" *Bledsoe I*, 342 F.3d at 646 (alteration in original) (quoting 31 U.S.C. § 3730(e)(4)(B)). The "original source" restriction is intended to "'prevent 'parasitic' qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of government fraud.'" *Id.* at 646 n. 8 (quoting *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 943 (6th Cir. 1997)).

Thus, the Court must determine the following: (1) whether there was a public disclosure, (2) whether the *qui tam* allegations are "based upon" that public disclosure, and (3) whether Relator was an original source of the information forming the basis of the *qui tam* claim. *Bledsoe I*, 342 F.3d at 645.

As an initial matter, the Court notes that McNulty assumes inconsistent positions regarding the claims that in fact underlie his *qui tam* action. On the one hand, in an effort to escape application of the Release Agreement to his *qui tam* claim, McNulty disavows the market allocation conspiracy as the basis for his claim of fraud on the government. Simultaneously, however, McNulty represents that "of course" the *qui tam* claims are based in part on the alleged anticompetitive market behavior at the heart of the related cases because that illegal agreement permitted Defendants to "across the board" overcharge the federal government for packaged ice. At the same time, McNulty alleges that the *qui tam* claim is based on information that he only "gleaned" after he signed his Release Agreement, i.e. the Arctic Glacier price gouging and the government contracts.

Notwithstanding these inconsistencies, there can be no question that the allegations in the *qui*

*tam* Complaint that relate to the underlying alleged market allocation scheme were publicly disclosed long before McNulty filed his *qui tam* Complaint. In fact, the allegations regarding the alleged conspiracy among the Defendants to divvy up the nationwide market for packaged ice are virtually identical to the allegations made in other litigation proceedings that were filed before the instant *qui tam* Complaint. Several of the antitrust actions that were consolidated in this Court on June 5, 2008 by the Multidistrict Litigation Panel ("MDL") were filed months before the MDL Consolidation Order and describe various sources for the allegations of their complaints. *See, e.g. Marin Scotty's Martin, Inc. v. Reddy Ice, et al.*, No. 08-1486 (N.D. Cal. Mar. 17, 2008) (E.D. Mich. No. 08-12640) (Compl. ¶¶ 33-34, alleging that the DOJ investigation into the packaged ice industry stemmed from a complaint made by a Canadian ice company, Polar Ice, regarding Arctic Glacier's strong-arm tactics in Edmonton, Alberta, Canada).

Nor is there any doubt that McNulty claims that his *qui tam* allegations are based in part upon these publicly disclosed allegations. At the hearing on this matter, counsel for Relator McNulty conceded that his *qui tam* Complaint was "certainly based on the antitrust allegations" because it was "through the conspiracy they inflated the price that they were charging the government." Regardless of whether such allegations could ever amount to a claim of fraud on the government, according to McNulty himself, the "price gouging" allegations derive directly from the market allocation conspiracy and thus the *qui tam* claim is "based upon" a public disclosure.

Finally, McNulty cannot escape application of the public disclosure bar in this case because he is not the original source of the information that forms the basis for the *qui tam* claim. Even if McNulty can claim to be the original source of the allegations regarding the nationwide market allocation conspiracy (which he claims to be based on his original disclosure of the alleged

13

conspiracy and revelations to the government which he claims formed the basis for the DOJ investigations), he cannot claim to be the original source of the only allegations that relate in any way to the FCA claim itself. McNulty claims that he "learned on September 7, 2005 [after his termination from Arctic Glacier] that the market allocation scheme overcharges extended to sales to the federal government, and he voluntarily disclosed this information to [sic] DOJ." (Dkt. No. 48, McNulty's Resp. 6.) The information that McNulty claims to have learned on September 7, 2005 however, relates only to a rumor he heard from a former co-worker that Arctic Glacier was price gouging the federal government on ice purchases following hurricane Katrina. (Compl. ¶ 36.) First, it is difficult to see how this allegation relates to any Defendant other than Arctic Glacier or how it amounts to fraud on the government. More importantly, however, McNulty does not have "direct and independent knowledge" of this information, which he alleges was conveyed to him by Geoff Lewandowski, an employee of Arctic Glacier, only after McNulty was terminated by Arctic Glacier. McNulty was no longer employed by Arctic Glacier at the time and could not possibly have "observed" or "learned" this information firsthand. *See United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1054 (10th Cir. 2004) (holding that to qualify as a direct source, a relator must "see the fraud with [his] own eyes or obtain [his] knowledge of it through [his] own labor unmediated by anything else. . . .") (quoting *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 (9th Cir.1996)). A relator's knowledge "must not be derivative of the information of others, even if those others may qualify as original sources." *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1006-07 (10th Cir. 1996).

The only other "source" of information on which McNulty relies to support his allegation that the market allocation scheme overcharges extended to sales to the federal government is a report

printed from www.fedspending.org that lists certain contracts that certain Defendants had with the

federal government.  That McNulty had a sudden epiphany that inspired him to research publicly

available data on the Defendants' contracts with the federal government does not qualify him as an

original source of knowledge of fraudulent claims for payments on those contracts.   There is no

question that McNulty retrieved the report from a publicly available website and, other than offering

the inference that Defendants must have overcharged the government on each and every claim that

must have been submitted in connection with those contracts, McNulty provides no factual

information regarding even a single claim that was actually submitted to the government for

payment.  He brings nothing to light in this regard that the government could not have deduced for

itself, knowing as it did that the government purchased ice on a widespread basis from the

Defendants, among others.  A "prediction" cannot qualify as direct and independent knowledge and

McNulty has alleged no independent and direct knowledge of inflated claims for payment made by

any of the Defendants to the government.  *See Rockwell*, 549 U.S. at 475-76.[3]

---

[3]   McNulty relies heavily on *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14
F.3d 645 (D.C. Cir. 1994) to support his argument that his *qui tam* Complaint is not based on
publicly disclosed information and that he is an original source. However, in that case there were no
"allegations of fraud" in the public domain, only publicly disclosed "transactions" from which fraud
could not be discerned without the "essential" information provided by the *qui tam* relator who was
the only source of that critical information.   Here, by contrast, there were publicly disclosed
allegations of the anticompetitive agreements that McNulty claims in part formed the basis of the
alleged fraud on the government.   Also publicly available was the information regarding the
existence of the allegedly inflated government contracts, sufficient to inform the government of the
possibility of fraud.  *See United States ex rel. Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir.
2004) (distinguishing *Springfield* and enforcing the public disclosure bar where a combination of
allegations and transactions available in the public domain from various sources were "sufficiently
definite to give the government enough information about possible fraud").  And, importantly,
McNulty is not the original source of the allegations that he deems to be the defining element in his
*qui tam* claim, i.e. the "price gouging" of the federal government.  McNulty cannot claim to have
disclosed the "essential link" that the relator in *Springfield* was deemed to have provided.

The Court concludes that there was a public disclosure, that the *qui tam* allegations are based upon that disclosure and that McNulty is not the original source of the allegations that form the basis for the *qui tam* claim. Because McNulty's allegations are based upon publicly disclosed information and because McNulty was not the original source of the allegations relating to the allegedly false claims which he presumes were submitted to the government, the Court lacks subject matter jurisdiction over the *qui tam* Complaint.

2.  **Even assuming that the Court could exercise jurisdiction over McNulty's *Qui Tam* Complaint, the Complaint must be dismissed for failure to allege the elements of the FCA claim with sufficient particularity.**

Defendants argue that the Federal Rule of Civil Procedure 9(b) requirements that fraud be pleaded with particularity applies to FCA claims. In *Bledsoe I*, the Sixth Circuit dispelled any notion that a FCA suit might escape the pleading strictures of Rule 9(b), noting that the FCA was originally enacted to combat the "massive frauds perpetrated by large contractors during the Civil War," and was at its heart an "anti-fraud" statute. *Bledsoe I*, 342 F.3d at 641 (quoting *United States v. Borstein*, 423 U.S. 303, 309 (1976) and *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995)). Thus, "a complaint alleging [a FCA] claim must state the circumstances surrounding the FCA violation with particularity." *Bledsoe I*, 342 F.3d at 642-43. The *qui tam* complaint must "identify specific parties, contracts, or fraudulent acts" and may not "rely upon blanket references to acts or omissions by all of the 'defendants.'" *Id.* at 643 (internal quotation marks and citations omitted).

In *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007) ("*Bledsoe II*"), the Sixth Circuit further clarified that a relator must identify specific false claims with particularity, and cannot just aver the existence of a fraudulent scheme, holding that "pleading an actual false claim with particularity is an indispensable element of a complaint that

16

alleges a FCA violation in compliance with Rule 9(b)." *Id.* at 504. In the context of the FCA, then, the *qui tam* complaint "must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government – or, in the locution of [the Sixth Circuit's] decision of *Sanderson*, the fraudulent claim is the *sine qua non* of a False Claims Act violation." *Id.* at 504 (internal quotation marks and citation omitted). In so holding, the Sixth Circuit expressly rejected the reasoning of other courts that had found sufficient particularity in allegations of systematic fraudulent schemes spanning the course of several years that allegedly gave rise to a belief that false claims had been submitted. *Id.* at 505 n.13.

Thus, the allegations of the *qui tam* complaint "must specifically allege the essential elements of fraud that constitute a violation of the [FCA] statute," which necessarily include "time, place and content" of the alleged misrepresentation. *Id.* at 505. Because the "false claim" itself is a requirement of the cause of action, it is not sufficient that the complaint allege the underlying fraudulent conduct with particularity – the complaint must also allege the presentation of a false claim for payment to the government with the same particularity. *Id.* Finally, "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme," those examples may suffice where they are "*representative samples* of the broader class of claims." *Id.* at 510 (emphasis in original).

The failure to indicate the amount by which an alleged false claim has been inflated is fatal to a FCA claim. *Id.* at 512-13 (holding that absent the details of when allegedly inflated cost reports were submitted, or by how much they were inflated, *qui tam* complaint failed to state a FCA claim). Rule 9(b) does not "permit a False Claim Act plaintiff merely to describe a private scheme in detail

17

but then to allege simply . . . that the claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). "[B]ecause the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment'" (*United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)), the FCA Complaint must contain specific allegations that the defendant "knowingly ask[ed] the Government to pay amounts it d[id] not owe." *Sanderson*, 447 F.3d at 877. Presentment of the fraudulent claim itself is "the *sine qua non*" of a FCA claim. *Id.* at 878 (quoting *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). "A 'claim' at least requires a request or demand . . . for money or property." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 447 (6th Cir. 2008).

In *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 2008) (*SNAPP I*), the Sixth Circuit affirmed the district court's dismissal of a *qui tam* complaint that failed to plead even a single false claim with particularity, but vacated the district court's decision denying SNAPP's motion to amend and remanded with instructions to the district court to consider SNAPP's proposed amended complaint in light of the Sixth Circuit's holding in *Bledsoe II* that certain "complex and far reaching schemes" may be pleaded by means of "characteristic" or "illustrative" examples. 532 F.3d at 506. On remand, the district court again concluded that the amended complaint failed to plead a false claim, holding that "the 'listing' of sixty five contracts between Ford and the government did not then and does not now provide [the] Court with any evidence as to even a single *claim for payment* made by Ford to the government . . . ." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, No. 06-11848, 2009 WL 960482, at *9 (E.D. Mich. April 7, 2009) (emphasis in

18

original). The amended complaint alleged that the government had awarded certain contracts to Ford based on Ford's allegedly fraudulent conduct and listed the dollar value of each allegedly fraudulently procured contract. The court rejected the relator's argument that the contracts evidenced requests for payment as required by the FCA:

> Nothing in *Bledsoe II* makes a "listing" of contracts awarded to Ford, the value of the contracts, and the number of vehicles awarded to Ford the same as a "request or demand, whether under a contract or otherwise, *for payment*." *See* 31 U.S.C. § 3729. . . . Moreover, the listing does not describe the information included in it as being funds actually paid by the government to Ford, but rather, only as the "value of the contract." In short, the contracts SNAPP relies on are not the specific or characteristic examples of Ford's claims for payment which are required under *Bledsoe II*.

2009 WL 960482, at *8, 9 (emphasis in original). The Sixth Circuit affirmed the district court in *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505 (6th Cir. 2010) (*SNAPP II*), clarifying that "none of the holdings of *Bledsoe II* alter the requirement that at least one claim be pleaded with specificity, or provide support for the argument that a contract-even an especially well-identified one-is a "claim" within the meaning of the FCA." *Id*. at 514.

Recently, in *Chesbrough, MD v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011), the Sixth Circuit had occasion to revisit and rely on its decisions in *Bledsoe II, Sanderson, SNAPP II* and *Marlar* to dismiss a FCA complaint that failed to plead with particularity that the allegedly false scheme there resulted in the actual presentment of false claims to the government for medicare reimbursement. The relators in *Chesbrough* alleged that the defendant submitted claims to the government for, among other things, certain tests that were nondiagnostic and allegedly of no medical value and attached copies of 5 studies allegedly representative of the claims. *Id*. at 470. The Sixth Circuit held that, although the relators had alleged a fraudulent scheme with respect to such studies, they failed to allege with particularity any billings for those tests that were actually submitted to the government,

19

and their lack of personal knowledge of the defendant's actual billing practices was fatal to any inference which might arise from the studies themselves:

> In *Bledsoe*, *Sanderson*, and *Marlar*, we imposed a strict requirement that relators identify actual false claims. The Chesbroughs have no personal knowledge that claims for nondiagnostic tests were presented to the government, nor do they allege facts that strongly support an inference that such billings were submitted. We therefore conclude that the Chesbroughs' complaint fails to satisfy Rule 9(b).

655 F.3d at 472.

McNulty's *qui tam* Complaint suffers from similar deficiencies. McNulty states in his *qui tam* Complaint that the government has paid in excess of $150 million for the procurement of ice during the course of the conspiracy. (Compl. ¶ 34.) McNulty then attaches three separate Exhibits in support of his theory of liability. First, he attaches a May 26, 2005 letter to the DOJ regarding the alleged "long standing collusionary relationships" among the Defendants and complains that he and his family have suffered great indignities as a result of being "blackballed" from the packaged ice industry. (Compl. Dkt. No. 18, Ex. 1.) This letter does not contain any allegations regarding fraud on the government or make mention of any false claim that McNulty alleges the Defendants presented to the government for payment. Indeed, in his brief in response to Arctic Glacier's motion to dismiss, McNulty expressly states that he only learned of the facts allegedly supporting his *qui tam* Complaint on September 7, 2005, after this letter was written:

> Arctic Glacier cannot plausibly allege that [sic] that Mr. McNulty was aware of his *qui tam* claims or that Mr. McNulty had an enforceable *qui tam* cause of action on February 17, 2005. Rather, Mr. McNulty did not learn of specific fraudulent overcharges to the government until after February 17, 2005. (Compl. ¶ 36) (alleging that on September 7, 2005, Mr. McNulty tape recorded a conversation in which a participant in the ice industry's conspiracy admitted that Arctic Glacier was "price gouging" FEMA in connection with providing ice in the aftermath of Hurricane Katrina) . . . Arctic Glacier['s assertion that the *qui tam* Complaint is based on the alleged market allocation scheme] ignores Mr. McNulty's allegation that he did not learn about overcharges to the government until September 2005 and, therefore, did

not have a *qui tam* claim at that time.

Dkt. No. 48, 13, n. 6. Thus, McNulty expressly disavows that the market allocation scheme is the "fraud" that supports his *qui tam* Complaint. Based on all that he knew at the time, he claims he could not have inferred fraud on the government from the allocation scheme standing alone. The "fraud," according to McNulty, is to be found in the materials attached as Exhibits 2 and 3 to his *qui tam* Complaint, information he claims to have "gleaned" sometime after September, 2005.

In Exhibit 2, McNulty relies on a website printout, obtained from the publicly available website www.fedspending.org, purporting to be a list of contracts between various agencies of the federal government and certain Defendants (as well as non-Defendant ice companies), for various products and services including "food preparation and serving equipment," "service and trade equipment," "subsistence," "utilities and housekeeping," and "water purification and sewage treatment equipment." (Dkt. No. 18, Compl. Ex. 2.) The Complaint alleges that this "listing" of contracts, printed off of a government website, is evidence of the "false claims for payment" allegedly made by the Defendants to the government. (Compl. ¶¶ 35, 37 39.) Mr. McNulty alleges that the essence of his *qui tam* claim is that the conspiracy to allocate markets resulted in "higher across-the-board prices for packaged ice," and that "each and every invoice submitted to the United States under [the contracts identified in his Complaint] were fraudulent as a result of the scheme to defraud." (Dkt. No. 48, Relator's Resp. 9.) Mr. McNulty "asserts that *every* invoice submitted by Defendants to the United States was a false claim in light of the inflated prices that resulted from the antitrust conspiracy." (Dkt. No. 48, McNulty's Opp. to Arctic Glacier's Mot. to Dismiss, 9.)

This shotgun approach to pleading fraudulent presentment of claims to the government utterly fails to allege a FCA claim with the particularity required by *Bledsoe II*, *Sanderson*, *SNAPP*

21

*II*, *Marlar* and *Chesbrough*. McNulty alleges absolutely no first-hand knowledge of how any of the Defendants negotiated these contracts or of how they billed the federal government under any of the contracts on the list. McNulty makes no allegation regarding the time, place or content involved in the creation of these various contracts, whether they were the product of competitive bidding, whether the prices indicated were even "high" in each and every case or whether or in what manner any invoices submitted pursuant to the contracts amounted to a false statement on which the government relied to its detriment. He asks the Court to assume that because the Defendants allegedly divided the market for packaged ice nationwide, it must therefore be true that each and every contract represented on the list that he obtained from a public website and attached to his *qui tam* Complaint must have resulted in a false claim to the government. *SNAPP II* instructs that "contracts" are not "claims," and *Bledsoe II, Sanderson, Marlar* and *Chesbrough* emphasize that the time, place and content of the actual false claims allegedly presented to the government for payment are essential elements of a FCA claim. McNulty's listing of contracts provides none of this critical information. The *qui tam* Complaint does not even identify one representative contract with any specificity that might possibly serve as a basis on which the Court could infer that every listed contract was somehow similarly infected.

Mr. McNulty's last piece of "evidence of fraud" is contained in Exhibit 3 to his *qui tam* Complaint. This Exhibit purports to be an e-mail from McNulty to FBI Agent Greg Stejskal, dated September 7, 2005, informing Agent Stejskal that McNulty heard from someone at Tropic Ice that someone from Arctic Glacier had told him that Arctic Glacier was "price gouging" FEMA on "the product they are selling to them for the Hurricane Relief." (Dkt. No. 18, Compl. ¶ 36, Ex. 3.) First, this Exhibit, and the allegations that accompany it, say absolutely nothing about the conduct of any

Defendant other than Arctic Glacier. More importantly, however, and fatal to McNulty's FCA claim, is that there is no allegation that ties this alleged incident of "price gouging" to any of the contracts listed in Exhibit 2. There is no allegation regarding the time, place or content of any claim related to this alleged act of price gouging. The *qui tam* Complaint contains no facts whatsoever regarding a specific claim for payment to the government in connection with this alleged act of "price gouging." (Compl. ¶ 36.)

These allegations contain none of the specificity required to state a claim under the FCA – there is no mention of time, place or content of any alleged claim for payment. The Court is to presume that false claims were presented "in connection with numerous contracts" listed in the Complaint. But the Complaint itself contains not one allegation of an actual claim for payment that was submitted to the government. "[A] contract is not a claim." *SNAPP*, 2009 WL 960482, at *7. Under *Sanderson*, *SNAPP II* and *Bledsoe II*, these allegations do not meet the particularity requirement to state a claim under the FCA. A *qui tam* relator must do more than "describe a private scheme in detail" and then merely allege that "claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Sanderson*, 447 F.3d at 877. Relator McNulty has not provided the court with evidence of even "a single specific claim for payment." *SNAPP*, 2009 WL 960482, at *9. On this basis alone, the *qui tam* Complaint should be dismissed.

Moreover, Relator McNulty offers no facts as to how the alleged market allocation conspiracy translated specifically into false or inflated claims being presented to the government. Defendants assert, correctly, that "McNulty jumps from his assertion of conspiracy to the *conclusion* that the government was overcharged, asserting no facts along the way." (Arctic Glacier Mot. 14.)

23

(Emphasis in original.) McNulty makes no allegation as to what portion of that $150 million might be attributable to the alleged fraudulent conspiracy or how the conspiracy resulted in inflated prices specifically to the federal government. The failure to indicate the amount by which an alleged false claim has been inflated is fatal to a FCA claim. *Bledsoe II*, 501 F.3d at 512-13. *See also United States ex rel. Zeller v. Cleveland Constr., Inc.*, No. 99-621, 2007 WL 893053, at *4 (S.D. Ohio March 22, 2007) (holding that plaintiff's failure to indicate how the allegedly false claims were inflated, or by how much, failed to meet the pleading standards to state a FCA claim under Rule 9(b)).

Allegations that all claims made to the government for purchases of packaged ice necessarily would violate the FCA because Defendants had conspired to allocate markets and territories must fail without specific factual allegations regarding the filing of the claims themselves. *Sanderson*, 447 F.3d at 877. *See also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003) (statements that "virtually every certification was fraudulent" and "virtually every" alloy submitted was non-compliant, failed to sufficiently identify which claims were false). The *qui tam* Complaint fails to identify any "claims" for payment, let alone identifying which of the many listed "contracts" resulted in supposed presentment of false claims or the content of those allegedly false claims. In short, regardless of the particularity with which McNulty pleads the underlying allegedly anticompetitive scheme among the Defendants to allocate markets, his claim that this scheme resulted in the actual presentment of false claims to the Government fails to meet the Rule 9(b) pleading requirements applicable to claims under the FCA. For this reason, his *qui tam* claim must be dismissed.

24

B.    **Because the Government was Unaware of the Underlying Allegations of Fraud that McNulty Claimed Formed the Basis for His *Qui Tam* Complaint at the Time McNulty Signed His Release Agreement, Enforcement of McNulty's February 17, 2005 Release Agreement to Bar the Filing of the *Qui Tam* Claim Would be Precluded on Public Policy Grounds, Entitling McNulty to Dismissal of Arctic Glacier's Counterclaim.**

McNulty alleges in his *qui tam* Complaint, and also alleged in his earlier-filed whistleblower complaint, that he learned in late 2004 that the Defendants had divided up the United States market for packaged ice and agreed not to compete for business in each others' respective territories. He alleges that he was terminated on January 27, 2005 for voicing to Arctic Glacier his opposition to the illegal agreement and for his refusal to participate in the market allocation conspiracy. On February 17, 2005, in exchange for a severance package negotiated as part of his termination by Arctic Glacier, McNulty executed a Release, Discharge and Non-Competition Agreement ("the Release"), waiving any and all claims against Arctic Glacier in exchange for six months' severance pay. (Dkt. No. 31, Counterclaim, Ex. A, Release Agreement ¶ 2.) In the Release, McNulty agrees as follows:

> In consideration for the money to be paid . . . as severance (the "Severance Pay") and other good and valuable consideration, I release and agree not to sue the Company, its current, former and successor subsidiaries, parent corporations, affiliates and partners, and each of their officers, directors, employees, agents, representatives . . . . or any other related parties, with respect to any claims that I have, or anyone claiming for me might have, prior to or as of the time I sign this Agreement.

*Id.*

In an Opinion and Order issued on May 29, 2009 in McNulty's whistleblower case, *McNulty v. Reddy Ice, et al.*, No. 08-13178, this Court held that the Release unambiguously barred any of McNulty's claims that were based on the alleged market allocation scheme of which McNulty admitted he was aware before he signed the Release: "[T]he release unambiguously provides that it covers 'any claims that [Plaintiff has] . . . prior to or as of the time [he] sign[s] this [Release].'

25

Because the Complaint clearly demonstrates that Plaintiff knew of the alleged market allocation scheme at the time he signed the Release, any claims based on Arctic Ice's involvement in that scheme are barred by the Release." (Dkt. No. 84, *McNulty v. Reddy Ice, et al.*, No. 08-13178, Opinion and Order, May 29, 2009.)

Arctic Glacier has filed a counterclaim against McNulty in this *qui tam* proceeding, alleging that McNulty has breached the Release Agreement by filing this case, which Arctic Glacier asserts is based entirely on the alleged market allocation conspiracy of which McNulty expressly had knowledge prior to signing his release, as found by this Court in its May 29, 2009 Opinion and Order. Arctic Glacier seeks return of the severance pay remitted to Mr. McNulty and also seeks its costs and attorneys' fees incurred in connection with defending the *qui tam* action. McNulty responds that the Release does not apply to the claims asserted in the *qui tam* Complaint because he was not aware of any instances of fraud on the government when he signed the release. He alleges that he only became aware of specific fraudulent overcharges to the government on September 7, 2005, when he was told by Geoff Lewandowski that someone at Arctic Glacier had told him (Lewandowski) that Arctic Glacier was price gouging FEMA in connection with products that they were selling in the aftermath of hurricane Katrina. Therefore, McNulty argues, under the Court's May 29, 2009 Opinion and Order, which refused to bar claims of which McNulty was not aware at the time he signed his release, his *qui tam* claims against Arctic Glacier are not barred by the Release. Arctic Glacier replies that it is "preposterous" for McNulty to ask this Court to believe that his one conversation with Geoff Lewandowski about price gouging after hurricane Katrina suddenly alerted McNulty, for the first time, to a widespread conspiracy against the government that affected each and every invoice submitted to the government under the multiple contracts attached to

26

McNulty's *qui tam* Complaint.   (Dkt. No. 49, Arctic Glacier's Opp. to Mot. to Dismiss Counterclaim, 12.)

Although the Court has concluded that it lacks subject matter jurisdiction over McNulty's *qui tam* action and that the Complaint fails to allege a *qui tam* claim under the FCA with sufficient particularity, neither of these rulings required the Court to address the issue presented by Arctic Glacier's counterclaim, i.e. whether McNulty was aware of his *qui tam* claim at the time that he executed his release. The Court's finding that the allegations regarding price gouging, of which McNulty claims he was unaware until after he signed the release, are insufficient to state a claim under the FCA does not negate McNulty's claim that he only learned of these allegations on September 7, 2005. Indeed Arctic Glacier does not contest the fact that McNulty learned of these allegations after he signed the release. Arctic Glacier simply asserts that these price gouging allegations are not really what informed McNulty's discovery of his *qui tam* claim – that instead Mr. McNulty knew of his *qui tam* claim based on the market allocation conspiracy, of which he had knowledge when he signed the Release. Arctic Glacier argues that this presents an issue of fact that merits further discovery, not dismissal.

However, McNulty also argues that, even assuming he did know of the *qui tam* claim at the time that he executed the Release, it is unenforceable in this case as a matter of public policy, which disfavors the release of *qui tam* claims of which the government was unaware at the time the claims were released. Contrary to McNulty's suggestion otherwise, there is no blanket rule prohibiting the enforcement of releases of *qui tam* claims that are entered into prior to the filing of a *qui tam* complaint. The FCA provides that an action under the statute "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."

27

31 U.S.C. § 3730(b)(1). This section has been interpreted to prohibit a relator from entering into an enforceable settlement agreement or release of a *qui tam* claim after the filing of a FCA action but does not address whether a release of *qui tam* claims, executed before the filing of *qui tam* complaint, is enforceable. "[T]he FCA does not by its terms address whether a release of claims entered into *before* filing a *qui tam* action bars subsequent *qui tam* claims." *United States ex rel. Nowak v. Medtronic, Inc.*, __F.Supp.2d__, 2011 WL 3208007, at *20 (D. Mass. July 27, 2011) (citing *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 326 (4th Cir. 2010) (emphasis in original).

"There is an emerging agreement within the Courts of Appeals that pre-filing releases bar subsequent *qui tam* claims if (1) the release can be fairly interpreted to encompass *qui tam* claims and (2) public policy does not otherwise outweigh enforcement of the release." *Nowak*, 2011 WL 3208007, at *21 (citing Courts of Appeals decisions in *Radcliffe*, 600 F.3d at 329; *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168-69 (10th Cir. 2009); *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 231-33 (9th Cir. 1997)). In analyzing the second prong, these courts have applied the balancing test set forth by the Supreme Court in *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987), which, in the context of FCA claims, weighs "the public interest in having information brought forward that the government could not otherwise obtain [against] the public interest in encouraging parties to settle disputes." *Nowak*, 2011 WL 3208007, at *21 (internal quotation marks and citation omitted). When considering a release of a claim in the prefiling period, the court's "focus must be on the incentive effect Congress intended to create and the importance of that incentive effect in achieving the FCA's goals of detecting and deterring fraud."

28

This analytical framework for analyzing the enforceability of prefiling releases was discussed

in *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995):

> We think it plain that enforcing a prefiling release of a *qui tam* claim would dilute
> significantly the incentives that Congress attempted to augment in amending the Act.
> If the release will be enforced, a party will have no right or reason to file a *qui tam*
> claim. We further believe that impairing these incentives will impair significantly
> the operation of the FCA. Although not all *qui tam* claims will be settled prior to the
> filing of an action, it appears that, for the reasons discussed below [that a relator
> stands to gain much more financially by settling individually with the defrauding
> party than rather than taking a percentage of the government's recovery in a *qui tam*
> suit], relators have significant incentives to enter into such agreements. . . . The Act
> reflects Congress's judgment that *incentives to file suit* were necessary for the
> government to learn of the fraud or to spur government authorities into action
> permitting a prefiling release when the government has neither been informed of, nor
> consented to, the release would undermine this incentive, and therefore, frustrate one
> of the central objectives of the Act. . . .

59 F.3d at 965-66 (emphasis in original) (internal quotation marks and citations omitted). The court

concluded that "prefiling releases of *qui tam* claims, when entered into without the United States'

knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." *Id.* at 969.

Critical to the court's conclusion in *Green*, was the fact that there "the government only

learned of the allegations of fraud and conducted its investigation *because of the filing of the qui tam*

*complaint*." *Id.* at 966 (emphasis in original). In that case, then, the public interest in bringing to

light a fraud that otherwise may have gone undetected outweighed the competing interest in settling

private disputes. The Ninth Circuit subsequently distinguished *Green* in *Hall*, 104 F.3d at 231-33,

where the prefiling release agreement had been entered into after the government was fully informed

of the allegations and had begun its own investigation. In such a case, the public interest in favor

of encouraging parties to settle private disputes outweighed the competing public interest in bringing

otherwise undetected fraudulent activity to light. *Id.* at 233. The courts in *Ritchie* and *Radcliffe*

reached similar conclusions, employing the same analytical framework, in both cases enforcing

29

releases where the government was aware pre-filing and pre-release of the fraudulent conduct at the heart of the relator's *qui tam* complaint. *See also Nowak*, 2011 WL 3208007, at *21 (discussing and following the decisions in *Green*, *Hall*, *Ritchie* and *Radcliffe*).

   While Arctic Glacier asserts that the government need only be made aware of the allegations prior to the filing of the *qui tam* complaint, it is clear that the policy interests discussed above would not be served if the government's knowledge did not precede the execution of the release. Each of the cases on which Arctic Glacier relies in fact involves a situation where the government was aware of the allegations before the release was negotiated and this appears to be the defining element in finding that the public interest has been served:

> Enforcing releases of qui tam claims only when allegations of fraud have been disclosed to the government *before the release* also has the benefit of encouraging voluntary disclosure by government contractors. . . . Contractors like Lockheed have an interest in settling qui tam claims prior to the filing of a lawsuit. If they can settle qui tam claims only after fraud allegations have been disclosed to the government, then contractors effectively have an incentive to disclose.

*Ritchie*, 558 F.3d at 1170 (emphasis added).

   Where the government has no knowledge of the claims that form the basis for a *qui tam* complaint prior to the time that the relator signs the release, enforcement of the release interferes with and frustrates the FCA's goals of incentivizing individuals to reveal fraudulent conduct to the government. Arctic Glacier insists that the "government knowledge" rule applies here because the government was well aware of the facts underlying the market allocation scheme prior to the time that McNulty filed his *qui tam* claim in June, 2008. True enough – but the issue is not what the government knew at the time the *qui tam* action was filed but what the government knew at the time the release was signed. In this case, prior to signing his release agreement, it is undisputed that

McNulty had not yet approached the government about the alleged market allocation scheme (let alone about any suspected fraud on the government). Under the logic of these cases, even assuming that the Release covers the *qui tam* claim, the Court concludes that public policy concerns on balance would not favor enforcement of the Release in this case.

Arctic Glacier additionally argues that this case is distinct from *Green* because in that case the whistleblower had informed his or her employer of his or her suspicions before the release was executed. Arctic Glacier argues that in this case, McNulty never informed Arctic Glacier of his suspicions that the Defendants were defrauding the federal government. (Dkt. No. 30, Arctic Glacier's Mot. to Dismiss Counterclaim, 9-11.) Arctic Glacier argues that an important aspect of the public policy against enforcing prefiling releases where the government is unaware of the alleged fraud, i.e. that if employers can only settle *qui tam* claims after disclosure to the government, then an employer will have an incentive to self-report, is not implicated where, as here, the employer is unaware of the employee's suspicions. Absent an awareness on the part of the employer of the employee's suspicions, Arctic Glacier argues, the employer has no reason to try to buy off the employee and the incentive to self-report is absent.[4] While this may have been an additional factor supporting the government knowledge rule that emerged from *Green*, Arctic Glacier has not provided the Court with any authority for the proposition that it is a *necessary* factor in applying the rule to deny enforcement of a release of a *qui tam* claim of which the government admittedly was unaware at the time of the signing of the release. Nor is the Court inclined to adopt such an

_____

[4] This argument presents an interesting Catch-22 for Arctic Glacier who argues on the one hand that this entire *qui tam* claim was wholly deducible from, and based upon, the market allocation allegations, yet argues on the other hand here that Arctic Glacier could not have deduced such a claim from McNulty's pre-release refusal to participate in what he described to Arctic Glacier executives as illegal market allocation behavior.

31

interpretation of the government knowledge rule.[5]    *See, e.g. United States ex rel. Bahrani v.*

*ConAgra, Inc.*, 183 F. Supp. 2d 1272 (D. Col. 2002) (refusing to enforce a prefiling release, where

defendants did not demonstrate that the government "both knew of Bahrani's allegations and

investigated them before Bahrani executed the Release in June, 1999," although the employer was

not aware of the relator's fraud claim at the time he executed the release).

Arctic Glacier argues that the government was well informed of the market allocation

conspiracy long before McNulty filed his *qui tam* complaint but does not argue, and no evidence has

been provided to the Court, that the government knew of the alleged fraud prior to the February 17,

2005 Release date.  McNulty's disclosures to the government began after he signed his release.

Thus, assuming that McNulty could state a valid *qui tam* claim that was covered by the Release, i.e.

that related solely to the market allocation conspiracy, public policy would prevent enforcement of

the Release in this case.  Accordingly, the Court GRANTS McNulty's motion to dismiss Arctic

Glacier's counterclaim.

---

[5] At oral argument on this matter, counsel for Arctic Glacier argued that the *Radcliffe* case supported this proposition because, according to Arctic Glacier, the employer there did not know about the alleged fraud at the time that the employee signed the release.  First, and most importantly, the dispositive issue supporting enforcement of the release in *Radcliffe* was the finding that the government knew about the alleged fraud at the time the release was signed and therefore the public interest had been served and the release was enforceable.  600 F.3d at 333.  The disputed issue in *Radcliffe* was whether the government must have fully investigated the fraud before the signing of the release, which the Fourth Circuit answered in the negative: "The proper focus of the inquiry is whether the allegations of fraud were sufficiently disclosed to the government, not on whether the government's investigation was complete."  600 F.3d at 332 (internal quotation marks and citation omitted).  Secondly, the employer in *Radcliffe* had been subpoenaed by the government, and several employees had been interviewed by the DOJ, prior to the date on which the relator signed his release. 600 F.3d 323.  Additionally, the relator himself had threatened his employer, albeit through an alias, with a whistleblowing lawsuit based on allegedly deceptive marketing practices.  *Id.* at 324.  Thus, even assuming that the employer's knowledge, or lack thereof, is a significant issue, *Radcliffe* does not carry the day for Arctic Glacier on this point.

## IV.  CONCLUSION

The Court GRANTS Defendants' motions to dismiss McNulty's *qui tam* Complaint because (1) the Court lacks subject matter jurisdiction over the claims; and (2) even assuming it could exercise subject matter jurisdiction, the *qui tam* Complaint fails to plead a FCA claim with particularity.

Further, the Court GRANTS McNulty's motion to dismiss Arctic Glacier's Counterclaim for breach of contract because public policy concerns would have barred enforcement of the Release in this case as to any covered *qui tam* claim.[6]

IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: 12-7-11

---

[6] Because of this disposition of the case, the Court need not address Arctic Glacier's argument that the Court lacks personal jurisdiction over Arctic Glacier Income Fund and Arctic Glacier, Inc. The Court notes, however, that it has twice before deferred ruling on personal jurisdiction issues relating to these entities in its prior opinions and orders in both McNulty's Whistleblower case and the Packaged Ice antitrust cases. The Court also need not address the Defendants' arguments that certain of the *qui tam* claims are barred by the applicable statute of limitations.